**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 26-cv-25375-BLOOM/Elfenbein**

RHETT P. GRIMES,

Plaintiff,

v.

XAVIER BELLO and MARC KAJOUJI,

Defendants.
_____________________________________/

**ORDER ON MOTION TO DISMISS**

**THIS CAUSE** is before the Court upon Defendants Xavier Bello ("Bello") and Marc Kajouji's ("Kajouji") (together, "Defendants") Motion to Dismiss and to Compel Arbitration Pursuant to the Federal Arbitration Act, or Alternatively to Stay, ECF No. [14] ("Motion"). Plaintiff Rhett P. Grimes ("Plaintiff") filed a Response in Opposition, ECF No. [19], to which Defendants filed a Reply, ECF No. [21]. The Court has considered the Motion, the supporting and opposing submissions, the record in this case, the applicable law, and is otherwise fully advised. For the reasons discussed below, the Motion is granted.

## I. BACKGROUND[1]

[1] Defendants' Motion requests two forms of relief: an order compelling arbitration as to Count I and an order dismissing Count II for failure to state a claim. *See generally* ECF No. [14]. Only the latter request is styled as a traditional motion to dismiss, the analysis of which requires the Court to accept all of Plaintiff's allegations as true and to generally confine itself to the Complaint. *See Martins v. Royal Caribbean Cruises Ltd.*, 174 F. Supp. 3d 1345, 1349 (S.D. Fla. 2016) (citing *Jackson v. Okaloosa Cnty., Fla.*, 21 F.3d 1531, 1534 (11th Cir. 1994)); *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007) (citing *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999)). In assessing Count I—for which Defendants seek an order compelling arbitration—the Court is permitted to (and, indeed, must) consider matters outside the pleadings. *Tracfone Wireless, Inc. v. Simply Wireless, Inc.*, 229 F. Supp. 3d 1284, 1292 (S.D. Fla. 2017). As such, the Court analyzes two factual backgrounds—one incorporating matters outside the pleadings for purposes of assessing the request to compel arbitration with respect to Count I and one based on Plaintiff's Complaint for purposes of assessing the request for dismissal of Count II.

### A. Count I—Motion to Compel Arbitration

#### i. Defendants' Relationship with Plaintiff

Great Point Capital LLC ("Great Point") is an SEC registered broker-dealer and a Financial Industry Regulatory Authority ("FINRA") member. ECF No. [14-4]. From June 2024 through October 2025—the time period relevant to this case—Plaintiff was a FINRA registered representative associated with Great Point. ECF No. [14-3]. He remains FINRA registered through Emerson Equity LLC. *Id.*[2] His registration record discloses "Other Business Activities," which include "RHETT PRICE GRIMES, LLC-INVESTMENT RELATED" doing business as Anchortree Capital *Id.*; ECF No. [14-2] ¶ 4. This business is described as follows:

> INSURANCE SALES, BUSINESS DEVELOPMENT FOR CPA'S THAT CHARGE A FEE TO PLAN/CONSULT TAX SALES TRAINING AND MARKETING., MEMBER MANAGER, IT'S AN LLC I OWN 100% AND WORK WITH CLIENTS ON LIFE INSURANCE SALES AND/OR FIXED INCOME PRODUCT SALES. I ALSO WORK WITH CPA ON BUSINESS DEVELOPMENT ITEMS SUCH AS SALES AND MARKET.

ECF No. [14-3]. Great Point viewed Anchortree as an outside business activity. ECF No. [19-7] ¶ 4.

Defendants are not brokers or dealers. ECF No. [14-1] ¶ 2; ECF No. [14-2] ¶ 2. In 2024, their accountant, Carmen M. Peters, CPA, and her firm, Peters Roman LLC, introduced Plaintiff as a financial professional with whom they worked—one who provided his own investment recommendations and financial planning services. ECF No. [14-1] ¶ 3; ECF No. [14-2] ¶ 3.

During the fall of 2024, Defendants contend that Plaintiff recommended that Defendants buy purported "Sovereign Tribal Tax Credits" (the "Credits") issued through White River Energy

[2] FINRA registration requires a representative to execute or acknowledge a Form U4, which contains an agreement to arbitrate any dispute with a customer "that is required to be arbitrated under the rules" of the self-regulatory organizations with which he registers. ECF No. [14-5] ¶ 5.

Corp. ("White River") to reduce their federal income tax bills. ECF No. [14-1] ¶¶ 6–8; ECF No. [14-2] ¶¶ 8, 10. Plaintiff disputes that he made such a recommendation and stresses that he did not present the credits as a Great Point product. ECF No. [19-7] ¶ 7.

Nonetheless, Plaintiff admits that he arranged a meeting for Bello with White River's affiliate, Nepsis Tax Advisors, LLP ("Nepsis"). *Id.* Defendants executed Tax Credit Purchase Agreements with White River between October 2024 and December 2024, wiring funds to Nepsis as directed by the Agreements. ECF No. [1-2] ¶¶ 20, 21. Plaintiff tracked the transaction throughout its life cycle, participating in calls with Nepsis. ECF No. [14-1] at 10–11; ECF No. [19-7] ¶ 7.

For an additional layer of protection, each Defendant also acquired an insurance policy through Plaintiff. ECF No. [14-1] ¶ 8; ECF No. [14-2] ¶ 10. Indeed, Plaintiff's assistant, Kerri Grimes, arranged Defendant Bello's coverage; the liaison coordinating the relevant paperwork referred to Defendant Bello as "Kerri Grimes' client." ECF No. [14-1] ¶ 8. Plaintiff shared with Defendant Kajouji the purchase receipt for his Credits, described as the "Tribal Credit Receipt." ECF No. [14-2] ¶ 12.

Over the span of a year, Plaintiff continued to bring Defendants a wide range of investment products and financial strategies, including several approved through Great Point. ECF No. [19-7] ¶ 10. On one occasion, Plaintiff told Defendant Bello that he had "access to like 30 or 40 something different investment funds." ECF No. [14-1] at 11. The products included the Credits and their associated insurance, private placement offerings, an affordable housing fund, oil and gas offerings, indexed universal life insurance, a premium-financed life insurance strategy, and a solar project investment. ECF No. [14-1] ¶¶ 15–18; ECF No. [14-2] ¶¶ 14–17.

In continuing this relationship with Defendants, Plaintiff at times used Great Point's own systems. For instance, in November 2024—ten days before Defendant Kajouji's purchase of the tax credits—Plaintiff emailed Defendant Kajouji to say that a Docusign containing broker dealer and sponsor documents would be sent from his Great Point email address. ECF No. [14-2] ¶ 7. That day, Kajouji received by Docusign Great Point's "intake form." *Id*. More generally, Plaintiff emailed Defendants from his Great Point email address; the emails contained Great Point's compliance legend "stating that securities are offered through Great Point Capital, LLC, a member of FINRA, SIPC, and IEX, and that Great Point archives and reviews its incoming and outgoing email." ECF No. [14-1] ¶ 5. Plaintiff used that email address—with its compliance disclaimer—in soliciting Defendant Bello's investment in a private placement real estate fund in January 2025. *Id.* ¶ 16. In September 2025, Defendant Kajouji received a Docusign from Plaintiff's Great Point email address confirming completion of a personal financial statement in connection with an investment. ECF No. [14-2] ¶ 16.

Plaintiff stresses that he used his Great Point email account when discussing Great Point-approved Regulation D offerings but did not send White River credit information from that email address. ECF No. [19-1] ¶ 12. He also notes that neither Great Point nor Anchortree received purchase funds or compensation from Defendants' White River purchases. *Id.* ¶ 16. Only his wife's company received compensation for administrative processing of paperwork related to the Credits. *Id*.

**ii. The Collapse of the Credits**

In December 2024, just after Defendant Bello's second purchase, Bloomberg reported that the Treasury Department said that the Credits did not exist. ECF No. [14-6]. In March 2025, the IRS confirmed in writing to the Senate Finance Committee that the Credits "do not exist" and that promoters "may be subject to civil or criminal penalties." *Id*.

Even when the Credits failed, Plaintiff remained involved. In May 2025, he emailed White River's Chief Financial Officer, copying Defendant Bello and Peters and identifying Defendant Bello as a "purchaser of tribal credits." ECF No. [14-1] ¶ 19; *id.* at 42. In June 2025, he worked on Defendant Bello's claim under the insurance he had presented. *Id.* ¶ 20. Plaintiff admits to "help[ing] facilitate communication" with White River and Nepsis but stresses that he did not do so because Great Point was servicing the transactions. ECF No. [19-7] ¶ 18.

In April 2025, the Internal Revenue Service ("IRS") disallowed Defendant Bello's claimed Credit, demanding $457,001.25 and explaining that only credits authorized by federal statute are allowable. ECF No. [14-1] ¶ 21. Defendant Bello paid the resulting IRS obligation. *Id.*

**iii. The FINRA Proceedings and Present Lawsuit**

On June 14, 2026, Defendants began the FINRA proceedings, an arbitration (the "FINRA Arbitration"), against Plaintiff and Great Point, asserting breach of fiduciary duty, negligence and gross negligence, negligent misrepresentation, failure to supervise under FINRA Rule 3110, and breach of contract, demanding not less than $524,516.13. *See generally* ECF No. [1-2].

On August 10, 2026, Plaintiff filed the present lawsuit, seeking to enjoin the FINRA Arbitration and asserting two claims: Declaratory Judgment (Count I) and Injunctive Relief (Count II). ECF No. [1]. Defendants then filed the instant Motion, asking the Court to (1) dismiss Count I by compelling arbitration or, in the alternative, stay the action pending arbitration, and (2) dismiss Count II for failure to state a claim. ECF No. [14]. Plaintiff filed a Response in Opposition, ECF No. [19], to which Defendants filed a Reply, ECF No. [21]. The Motion is now ripe for review.

**B. Count II—Motion to Dismiss**

As alleged in the Complaint, on June 14, 2026, Defendants initiated an arbitration filed with the FINRA Dispute Resolution Services. ECF No. [1] ¶ 9. Plaintiff received the Statement of Claim on June 28, 2026. *Id.* ¶ 10. Defendants demand compensatory damages of not less than

$524,516.13, as well as other damages related to tax credits that they purchased from White River pursuant to Tax Credit Purchase Agreements that were entered into solely between Defendants and White River. *Id.* ¶¶ 11, 17.

The Statement of Claim alleges that Plaintiff promoted false representations made by an issuer, White River, and Defendants' purchase of tax credits constituted private securities transactions. *Id.* ¶ 13. It further alleges that: (1) on October 11, 2024, Defendant Bello purchase a White River tax credit for $400,000 face amount; (2) on December 12, 2024, Defendant Bello purchased another White River tax credit for $116,667 face amount; and (3) on December 12, 2024, Defendant Kajouji purchased a White River tax credit for $200,000 face amount. *Id.* ¶¶ 14–16.

Defendants never purchased a security from Plaintiff, and Defendants never opened or owned a securities account for which Plaintiff served as their registered representative. *Id.* ¶¶ 18, 19. Grimes did not sell Defendants the tax credits that they purchased from White River. *Id.* ¶ 20. The tax credits were not issued pursuant to Regulation D of the Securities Act of 1933. *Id.* ¶ 22. Defendants did not enter into written agreements to arbitrate disputes with Plaintiff. *Id.* ¶ 26.

Instead, pursuant to the Tax Credit Purchase Agreements entered into between Defendants and White River, Defendants agreed to mediate and then arbitrate any disputes with White River concerning any dispute, disagreement, or issue of construction or interpretation arising under the Tax Credit Purchase Agreements. *Id.* ¶ 27. Defendants have never had brokerage accounts for which Plaintiff served as their registered representative, nor have Defendants purchased any securities from Plaintiff. *Id.* ¶ 28.

## II. LEGAL STANDARD

### A. Motion to Compel Under 9 U.S.C § 3

"The Federal Arbitration Act ('FAA') establishes a general federal policy favoring arbitration." *Mims v. Glob. Credit & Collection Corp.*, 803 F. Supp. 2d 1349, 1352 (S.D. Fla. 2011) (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217–18 (1985)). "As a result of the well-established federal policy . . . the burden is on the party opposing arbitration to prove to the court that arbitration is improper." *Kozma v. Hunter Scott Fin., LLC*, No. 09-80502-Civ, 2010 WL 724498, at *2 (S.D. Fla. Feb. 25, 2010) (alteration added) (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26–27 (1991)). The party may fulfill this "affirmative duty" by "coming forward" with an "affidavit or allegation of fact" that shows cause why the court should not compel arbitration. *Sims v. Clarendon Nat'l Ins. Co.*, 336 F. Supp. 2d 1311, 1314 (S.D. Fla. 2004) (alteration added; quotation marks and citation omitted). And "unlike other contracts, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Multi-Financial Sec. Corp. v. King*, 386 F.3d 1364, 1367 (11th Cir. 2004) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) (internal quotations omitted)).

Importantly, "[t]he Eleventh Circuit treats a motion to compel arbitration as a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction." *Tracfone Wireless, Inc.*, 229 F. Supp. 3d at 1292. So, "in ruling on a motion to compel arbitration, the Court may consider matters outside of the four corners of the complaint." *Id.* Ultimately, "[i]n determining whether to compel arbitration, the Court considers three factors: (1) whether a valid written agreement to arbitrate exists, (2) whether an arbitrable issue exists, and (3) whether the right to arbitrate was waived." *Hilton v. Fluent, LLC*, 297 F. Supp. 3d 1337, 1341 (S.D. Fla. 2018) (citation omitted). Once a court determines that a lawsuit before it is based upon "any issue referable to arbitration under an

agreement in writing for such arbitration," the court shall "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3.

**B. Motion to Dismiss Under 12(b)(6)**

When ruling on a Rule 12(b)(6) motion to dismiss, a court generally focuses on the complaint itself. *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 n.7 (11th Cir. 2006) ("A court is generally limited to reviewing what is within the four corners of the complaint on a motion to dismiss."). Federal Rule of Civil Procedure 8(a)(2) requires pleadings to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 does not impose a requirement of "detailed factual allegations," but it does demand "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

To survive an attack by a Rule 12(b)(6) motion to dismiss, a complaint must therefore contain factual allegations that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "'[N]aked assertion[s]' devoid of 'further factual enhancement' " will not suffice. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). But a complaint may proceed if it contains "enough factual matter (taken as true) to suggest" the elements of the stated claims. *Twombly*, 550 U.S. at 556.

In evaluating the complaint, a court accepts as true the plaintiff's factual allegations and any reasonable inferences drawn from those facts. *Martins.*, 174 F. Supp. 3d at 1349 (citing *Jackson*, 21 F.3d at 1534). A court need not accept the plaintiff's legal conclusions as true. *Iqbal*, 556 U.S. at 679. And while a court makes reasonable inferences in the plaintiff's favor, it need not make the same inferences as the plaintiff nor accept "unwarranted deductions of fact." *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005) (quoting *S. Fla. Water Dist. Mgmt. Dist. v. Montalvo*, 84 F.3d 402, 408 n.10 (11th Cir. 1996)).

Although a court primarily considers only facts contained within the four corners of the complaint when ruling on a motion to dismiss, the court may consider additional documents when "a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss." *Fin. Sec. Assur., Inc.*, 500 F.3d at 1284 (citing *Harris*, 182 F.3d at 802 n.2).

## III. DISCUSSION

### A. Count I

Defendants argue that each element of FINRA Rule 12200, which establishes when arbitration is required, is satisfied here. ECF No. [14] at 9. Specifically, Plaintiff agreed in writing in his Form U4 and through FINRA's Rules to arbitrate customer disputes, Defendants are Plaintiff's customers, and the dispute arises in connection with Plaintiff's business activities as an associated person of Great Point. *Id.* at 9–17.

Plaintiff responds that while his Form U4 requires him to submit to arbitration under certain circumstances, this dispute does not fall within Rule 12200's scope. ECF No. [19] at 2–4. This is because Defendants' evidence does not establish the required business-activity connection. *Id.* at 4–8. And the cases relied upon by Defendants do not eliminate the Eleventh Circuit's requirement that the person be acting within their business capacity. *Id.* at 8–10.

Defendants reply that Plaintiff concedes there is an agreement to arbitrate, disputing only its scope, and doubts should be resolved in favor of arbitration. ECF No. [21] at 2–3. Moreover, Plaintiff's denial that Defendants were customers fails on the record. *Id.* at 3–4. Finally, established case law, including Plaintiff's case law, rejects Plaintiff's defense that he was acting in an outside business capacity. *Id.* at 4–9.

The Eleventh Circuit has indicated that courts should interpret FINRA Code "as it would a contract under the applicable state law." *MONY Securities Corp. v. Bornstein*, 390 F.3d 1340,

1342 (11th Cir. 2004) (citing *King*, 386 F.3d at 1367; *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987)). "Because the FINRA Arbitration Code is unambiguous, the parties' intent must be gleaned from the four corners of the document." *Pictet Overseas, Inc. v. Helvetia Trust*, 905 F.3d 1183, 1187 (11th Cir. 2018) (quoting *Crawford v. Barker*, 64 So. 3d 1246, 1255 (Fla. 2011) (internal quotations omitted)). "[T]he language of the Code itself is the best evidence of the parties' intent, and its plain meaning controls." *Id.* (internal quotation marks omitted). As a general matter, the FINRA Code constitutes a written agreement to arbitrate. *Deutsche Bank Sec. Inc. v. Simon*, No. 19-20053-CIV, 2019 WL 4864465, at *3 (S.D. Fla. Aug. 20, 2019), *report and recommendation adopted*, No. 19-20053-CIV, 2019 WL 4685876 (S.D. Fla. Sept. 26, 2019) (internal citations omitted).

FINRA Rule 12200 states, in relevant part, that parties must arbitrate if (1) arbitration is required by a written agreement or requested by a customer, (2) the dispute is between a customer and a member or associated person of a member, and (3) the dispute arises in connection with the business activities of the member or associated person. The Court analyzes each of these prongs in turn.

**iv. Whether Arbitration is Required by Written Agreement or Customer Request**

As an initial matter, Defendants establish, and Plaintiff does not dispute, that Great Point is a FINRA member and Plaintiff was an associated person of Great Point at all relevant times. *See* ECF Nos. [14-4], [14-3]. Furthermore, it is undisputed that, in connection with his registration, Plaintiff executed or acknowledged Form U4, under which he agreed to arbitrate any dispute "that is required to be arbitrated under the rules." ECF No. [14-5] ¶ 5. Those "rules" include Rule 12200, which requires FINRA members and associated persons to arbitrate disputes with customers upon the customer's request. *Raymond James Fin. Servs., Inc. v. Armijos*, No. 19-CIV-81692-RAR,

2020 WL 2026316, at *6 (S.D. Fla. Apr. 27, 2020) ("Those rules include Rule 12200, which requires a FINRA member *and its associated persons* to arbitrate certain disputes with customers before FINRA upon the customer's demand.").[3] Defendants here have requested arbitration.

Based on this, the Court finds that there is a written agreement to arbitrate, so long as it can be established that Defendants were Plaintiff's "customers" and the dispute arose in connection with Plaintiff's business activities.

**i. Whether Defendants are Plaintiff's Customers**

FINRA Rule 12100(k) defines a customer as one who is not "a broker or dealer." The Rule provides no further guidance as to the definition of a customer. That said, case law from within this Circuit is instructive.

In *King*, the claimant, Rua King, made certain investments on the advice of a registered representative of IFG, a member of FINRA's predecessor agency. 386 F.3d at 1365. The Eleventh Circuit found that King was a customer for purposes of assessing arbitration because she was a customer of IFG's associated person, notwithstanding that she had no direct transactional relationship with IFG. *See id.* at 1368–70. The court explained that the relevant rule merely defined a customer as one who is not a broker or dealer and declined to limit the definition of a customer to those having a direct relationship with an agency member because "[e]nforcing [that] limitation . . . would be tantamount to reading language into the Code that is conspicuously absent." *Id.* at 1368. Similarly, in *Bornstein*, the Eleventh Circuit concluded that the claimants were customers

[3] Even where there is no separate written agreement to arbitrate, the Eleventh Circuit has held that the Code serves as a written agreement to arbitrate, allowing customers to enforce its requirements. *King*, 386 F.3d at 1367 ("Although there is no direct written agreement to arbitrate . . . the Code serves as a sufficient written agreement to arbitrate, binding its members to arbitrate a variety of claims with third-party claimants.").

of the agency member because they were customers of the member's registered representative, who in turn provided bad investment advice to them. *See* 390 F.3d at 1344.

And multiple cases since have confirmed that the definition of customer is broad, sweeping in all those who are not brokers or dealers but nonetheless work with an associated person. *See, e.g.*, *Viyella v. Nicor*, No. 19-25094-CIV, 2020 WL 977481, at *6 (S.D. Fla. Feb. 28, 2020); *Simon*, 2019 WL 4864465, at *3, *report and recommendation adopted*, 2019 WL 4685876; *Ladenburg Thalmann & Co. Inc. v. Oragenics, Inc.*, No. 24-21431-CIV, 2024 WL 2945490, at *5 (S.D. Fla. May 3, 2024), *report and recommendation adopted*, No. 1:24-CV-21431, 2024 WL 2938821 (S.D. Fla. June 11, 2024); *Deutsche Bank Sec., Inc. v. Ades*, No. 18-25142-CIV, 2019 WL 1077905, at *3 (S.D. Fla. Mar. 7, 2019). Insofar as there is no dispute that Defendants are not brokers or dealers and they had a business relationship with Plaintiff, they qualify as customers based on Eleventh Circuit precedent.[4]

**ii. Whether the Dispute Arose in Connection with Plaintiff's Business Activities**

That leaves a final question—whether the dispute here arose in connection with Plaintiff's business activities. In *Pictet*, the Eleventh Circuit explained that "only disputes arising out of business activities of an associated person *as an associated person* are covered." 905 F.3d at 1188 (emphasis in original). That means that, to require arbitration, the dispute must have "some connection to the associated person's relationship with the FINRA member." *Id.* at 1189.

[4] Even under the more targeted definition of a "customer" adopted in other circuits, Defendants would still remain customers. The Second Circuit has stated that a "customer" is "[a] person or entity (not acting in the capacity of an associated person or member) that transacts business with any member firm and/or associated person." *UBS Fin. Servs., Inc. v. W. Virginia Univ. Hosps., Inc.*, 660 F.3d 643, 650 (2d Cir. 2011) (citation omitted). Based on this view, a customer "includes *at least* a non-broker or non-dealer who purchases, or undertakes to purchase, a good or service from a FINRA member." *Id*. (emphasis added). Here, there is no dispute that Defendants transacted business with an associated person (i.e., Plaintiff) and that, indeed, Defendants did purchase services from Plaintiff. Thus, Defendants are plainly customers of Plaintiff, an associated person.

Since *Pictet*, several courts have addressed this same question, providing additional guidance on what it means for a dispute to arise in connection with an associated person's business activities. Some have found that the requisite connection exists where the associated person's "correspondence with the [customer] reflected his dual association with both [the FINRA member] and [an outside company]." *Simon*, 2019 WL 4685876, at *2. By this view, as long as that dual association exists, the question of whether an associate person was "acting in his capacity as an associate . . . when recommending the investment" is a question for the arbitration panel. *Id.* at 3. Other courts have explained that it does not matter if the associated person is "engaging in investment-related activity in his individual capacity"—what matters is whether the activity at issue is "the sort of activity in which FINRA maintains a regulatory interest." *Shevland v. Orlando*, 629 F. Supp. 3d 1252, 1259–60 (S.D. Fla. 2022), *aff'd*, No. 1:21-CV-24324-DPG, 2023 WL 12058626 (S.D. Fla. Aug. 31, 2023). Others still have found that what matters is whether the "malfeasance involved services the member" itself offers—that is, whether "the dealings involved services that [the FINRA member] was also in the business of providing." *Equitable Advisors, LLC v. Jacobs*, No. 3:25-CV-00183-LMM, 2025 WL 4093560, at *4 (N.D. Ga. Oct. 28, 2025).

Based on any of those interpretations, the dispute here clearly arises in connection with Plaintiff's business activities. This is not a case like *Pictet*, where associated persons were not involved in the challenged sale at all, and it was an independent asset manager who engaged in the alleged fraud. *Pictet*, 905 F.3d at 1185–86. Rather, this case is far more factually analogous to *King*, wherein the claim "arose from the actions of the registered representative in giving advice regarding investments at a time when he was a person associated with a brokerage firm in the business of providing investment advice through its representatives." *Viyella*, 2020 WL 977481,

at *7 (citing *King*, 386 F.3d at 1370).[5] Plaintiff—an employee of a brokerage firm—facilitated multiple financial transactions for Defendants, including the very transaction at issue. That is sufficient to establish the requisite connection.

Plaintiff's counterarguments are unavailing. For instance, Plaintiff attempts to point to evidence that he was not acting in his capacity as a Great Point employee at the time of the disputed actions. ECF No. [19] at 4. He points out that he communicated at times using his personal email, including when discussing the very transaction at issue. *Id.* at 5. Moreover, he notes that neither Defendant ever opened or maintained a Great Point account and Great Point was uninvolved in the White River agreements. *Id*. But the facts in *King* were quite similar:

> IFG's representative did not correspond with King on letterhead referring to IFG, provide her with any documents referring to IFG, or indicate IFG was involved with her investment; and IFG did not approve of the sale of the investment by its representatives, have any record of the purchase of the investment by or for King, or receive or disburse funds for this transaction.

*Id.* (citing *King*, 386 F.3d at 1366). The Eleventh Circuit found the requisite nexus. *King*, 386 F.3d at 1370. Insofar as *King* remains good law, the Court cannot ignore its obvious binding effect here.

Plaintiff also argues that the Credits are not closely related enough to Great Point's business to generate the necessary nexus. ECF No. [19] at 6. True enough, in *Pictet*, the Eleventh Circuit explained that an associated person who, for instance, is a real estate agent on the side cannot be forced to arbitrate a real estate client's claim regarding a car accident that occurred while the agent and client were driving to see a home. *Pictet*, 905 F.3d at 1189. The court explained that "the relevant business activity—acting as a real estate agent—has nothing to do with the real estate agent's status as a partner of a FINRA member." *Id*. But the claims here are not "so attenuated."

---

[5] Moreover, Defendants allege that Great Point failed to supervise Plaintiff. ECF No. [1-2] at 23. Based on *King*, a "claim of negligent supervision satisfies the [business activities] condition." *King*, 386 F.3d at 1370 (collecting cases). That alone could provide reason to find the business connection element satisfied.

*Viyella*, 2020 WL 977481, at *8. Plaintiff provided Defendants some degree of investment advice or facilitation while employed by Great Point—it does not matter whether the claims "involve activity not explicitly sanctioned by the FINRA member." *Id*. And Great Point's Form BD reflects that it is in the business of "selling tax shelters." ECF No. [14-4] at 12. While Plaintiff was affiliated with Great Point, Great Point published a "Tax Mitigation Newsletter" which promoted the same categories of tax-related investments that Plaintiff recommended to Defendants. ECF No. [14-8]. That the newsletter was published after the sales at issue, as pointed out by Plaintiff, ECF No. [19] at 6, does not change the Court's conclusion that it is strong evidence of the overlap between Plaintiff's work with Defendants and Great Point's domain.

Fundamentally, Plaintiff devotes much of his argument to convincing the Court that, at the time of the challenged actions, he was not acting in his Great Point capacity. *See generally* ECF No. [19]. But that has never been the relevant inquiry in this circuit, even post-*Pictet*. Indeed, in *Viyella*, Viyella—the associated person—made several of the same arguments:

> Viyella has acknowledged he was not acting in his role as a Morgan Stanley financial advisor; Viyella communicated with Nicor about the promissory note through his personal cell phone and personal email; there were no communications between Nicor and Morgan Stanley about the promissory note; and Viyella disclosed to Morgan Stanley he established Terrena Properties as a "non-investment entity[.]"

*Viyella*, 2020 WL 977481, at *7. But none of those facts, taken as true, changed that "Viyella provided [] investment advice while Viyella was employed as a financial advisor at Morgan Stanley, and Morgan Stanley failed to supervise Viyella." *Id.* at *8.

Based on the above considerations, the Court finds that this dispute arose in connection with Plaintiff's business activities. Thus, all the elements of Rule 12200 have been satisfied, and the parties must submit to arbitration.

By logical extension, the appropriate disposition is to dismiss Count I, not to stay it. Count I seeks a declaration that Defendants' claims are not arbitrable. ECF No. [1] ¶ 46. The Court's conclusion here reaches the squarely opposite conclusion, finding that the dispute is subject to required arbitration.

In *Smith v. Spizzirri*, the Supreme Court held that 9 U.S.C. § 3 requires courts to stay cases, rather than dismiss them, when the Court determines that all claims in dispute are subject to arbitration. 601 U.S. 472, 477 (2024). Indeed, the Supreme Court explained that "§ 3 ensures that the parties can return to federal court if arbitration breaks down or fails to resolve the dispute." *Id.* However, *Spizzirri*'s logic is inapplicable here, as there are no underlying claims before the Court. That is, the *entire* dispute before the Court is the simple question of whether arbitration is required, so there is nothing to return to the Court for once the Court determines—as it does today—that arbitration is required. In this unique set of factual circumstances, the mandatory stay in § 3 does not apply, and dismissal of Count I is the appropriate disposition.

**B. Count II**

In Count II, Plaintiff seeks injunctive relief enjoining Defendants from further arbitration proceedings before FINRA. ECF No. [1] at 10. Defendants argues that Count II fails under Rule 12(b)(6) because injunctive relief is a remedy rather than a separate cause of action. ECF No. [14] at 20. Plaintiff responds that he does not rely on Count II as a separate substantive cause of action—instead, it states the injunctive relief requested if Plaintiff prevails on Count I. ECF No. [19] at 12.

As a general matter, injunctive relief is a remedy, not a cause of action. *See, e.g., Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1098 (11th Cir.2004) ("(A) traditional injunction is a remedy potentially available only after a plaintiff can make a showing that some independent legal right is being infringed[.]"). It cannot stand alone. Thus, because the Court dismisses Count I, the Court dismisses Count II as well.

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion, **ECF No. [14]**, is **GRANTED**. Plaintiff is required to submit to arbitration.
2. The above-styled case is **DISMISSED**.
3. To the extent not otherwise disposed of, all pending motions are **DENIED AS MOOT** and all deadlines are **TERMINATED**;
4. The Clerk of Court is directed to **CLOSE** this case.

**DONE AND ORDERED** in Chambers at Miami, Florida, on September 3, 2026.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record